There's a preliminary matter I wanted to let you know that Judge O'Malley is unable to be with us here today and if she was Judge O'Malley would be sitting in this chair as a presiding judge. She is attending this arguments via teleconference so she is listening to the arguments and will participate that way so I'm going to ask everybody to please speak clearly and loudly to make sure that she has the opportunity to understand today's arguments. After arguments Judge O'Malley will participate in the in the deliberations and and will assume otherwise all other roles of presiding judge. I'm just her helper today. So with that let's get to the first case. We have three cases for argument set for today. The first one is case number 18-1322 Rosetta-Wireless Corporation v. Samsung Electronic Company. Mr. Sauter, is that correct? Okay, you reserved four minutes of time for rebuttal. Okay, Mr. Ferguson you're going to respond for ten minutes and then Counselor Raymond you're going you have five minutes as cross-appellant. So you'll go after Mr. Ferguson in other words. Okay, okay good let's get started. Good morning, your honors. May it please the court. I'd like to begin today by addressing disputed claim language downstream data in claim one of the 511 patent and in particular I would like to propose a framework that I hope may be in the specification and in the claim. This framework is this in a certain a client-server relationship data always flows upstream from a client to a server and downstream from a server to a client and once that principle is recognized the petitioners claim construction and the prior art on which they rely for their obviousness arguments becomes all the more unreasonable. I want to unpack that for you. The WIPS, the Wireless Intelligent Personal Network server that's claimed in claim one is a server by definition. You refer to that as a source of server, is that right? The WIPS, your honor, is not the source server. We refer to the WIPS as the device that receives downstream data as it flows from an external source server down to a remote user who accesses that data through a display device. So the WIPS is not the source server. Where is a source server? The source server, your honor, is as explained for example in the, well throughout the specification in particular, I'll draw your attention to figure one in the specification and also column six, line 40 through line 7, line 40 I think provides a very clear description of both how they were trying to solve the problem that was at issue in describing the background of the 511. I'm looking at figure one, where is the source server? The source server, your honor, is the server that would be storing and providing the data in the IT network that's at the top of figure one. The enterprise IT system? That's correct, your honor. I guess an initial concern I have with your argument is that figure one is for a wireless synchronization system. Your claims are all directed just to the WIPS, which would be box 30 in figure one. So I don't see any of your claims claiming the overall wireless communications synchronization system shown in all the different components illustrated in figure one. The claim is just reduced down to, devoted to, dedicated to, focused on box 30, the server itself, the WIPS server itself. So you're, the trouble I'm having is that you're you're asking the court to read in some of these other components that are intelligent personal server, box 30. We're not asking that the court read in other elements, your honor. What we're asking is that it give meaning to the term downstream, in downstream data, which is what the WIPS is claiming. It's not claiming the receipt of every kind of data. It's claiming a certain arrangement of components to solve a particular problem. And part of that is the receipt of downstream data. And so the question is, well, what does downstream meaning, what does downstream mean as it qualifies data? And that's why I began this argument by trying to draw your honor's attention to that word and how a person of skill in the industry ordinarily understands. I understand that a dictionary definition doesn't resolve the issue, but it is informative. And it's never been disputed in this case that the WIPS is acting as a server and the display device is acting as a client in a server-client relationship. And there's ample evidence in the record, which I'll cite in just a moment, that when a client sends data to a server, that's an upstream flow. And when the server sends data back to the client, that is a downstream flow. It's an objective standard. It doesn't change based on your perspective. When the server, the WIPS server, sends data to the client, that's a downstream flow? Is that what I just heard you say? In a server-client relationship, there is a downstream flow when data is sent from a server to the client. There's an upstream flow from the client to the server. And I'll jump to why I think this is so important. So the petitioner's argument depends on the display device also acting as this source server and sending data downstream. In other words, their argument depends on adopting... I just want to make sure I'm tracking you and as I read the claim language. The claim language, again, is for a wireless intelligent personal network server comprising, among other things, an RF receiver for receiving downstream data transmitted over a first wireless communications channel. Now, right then and there, the downstream data seems to be flowing to the WIPS server, according to the claim. But I heard, you know, the way you want to argue this case, I'm hearing you say, no, the downstream data is information at the server that's being sent away from the server to the client. Precisely. So there are two things that could be going on here, and this is really my point. Well, can we just stick to the claim language? Because that's what I'm focused on. Exactly. So the question is, what is downstream referring to? One option, and this is the petitioner's argument, is downstream there is referring to the data that's flowing into the WIPS. If that is correct, if that is the right interpretation, it means the parties who drafted this patent used the word downstream exactly the opposite of how it would ordinarily be understood. And why can't we accept that, given that that's the way the claim is and the RF receiver of the WIPS server is receiving downstream data? It is, but the downstream, what that means, what downstream is getting at, is it's getting at the data is coming from another server and going to the user. That's why it's downstream. It's going from a server to a client. That's where you come up with a source server, correct? Correct. That's why it's downstream. Downstream isn't... But the problem is, I don't see a source server in the specification. Point to me in the patent where it describes or provides for a source server. I would refer, Your Honor, to column 6, line 40, through column 7, line 40, which describes a data flow exactly as... Now that's a data flow. I'm talking about a source server, which presumably is sending the data. It refers to a network, Your Honor. It refers to a network in figure 1 and also in column 6. So there is nothing in the patent that creates a source server? Or you can't point to the patent and say, Judge, this is a source server right here. The word source server doesn't appear in the specification. That's correct. But those are your words. These are the words you use. Correct. We are trying to give meaning to the term downstream. So if we find that there's no source server, then you lose your argument on downstream. Well, the specification does refer repeatedly to an IT network and the IT database. That's another issue, the IT network. But if we find there is no source server, then you lose on your argument on downstream. Well, I think implied, Your Honor, in the notion of a network as a server. That's how these networks work. There's a server that aggregates the data and then gives it out to clients when they receive it. So let's go to a network. A network presumes more than one computer, wouldn't you say? I believe that's correct, Your Honor. Where are there two computers involved in this? Show me in figure one the two computers. There's only one. In figure one, there could be three. That's how we have interpreted the flow of data downstream from the IT network, which is described in figure one. That would be a computer. It's acting as a server. It's collecting from other clients within that network data, files that you work on. Look at figure one and item 14. That's a computer. Correct. Is there any other structure or any other element in figure one that looks like 14? Is there another computer? The WIPS is storing that data and so is the display device is using it. And so the question is whether the display device can also be that computer that's the source, the IT network, or whether it's something separate from that. Their argument is that the display device is actually the same thing. And if you adopt, and this is my point, what I opened with, if you adopt that view, you also have to say that the parties intended the word downstream to mean the opposite of how a person of skill in the industry understands that. And I just want to give your honors, as I'm running out of time, a citation for where you can find that. So Rosetta's expert addressed this flow of data between client and server in his report. And where it's in the record is 5306 and 5308, as well as 5312 to 13. And he refers to several industry dictionaries, all of which confirm that data flows downstream from a server to a client, to a server, and those definitions are at 5394, 5396, 5399, and 5401. And Judge Arbus recognized these industry definitions as well at Appendix 84 in his dissent. Okay, you got 14 minutes. I will reserve the remainder of my time for further. Thank you. Counselor Ferguson, you got 10 minutes. Thank you, Your Honor, and may it please the court, Brian Ferguson, and I'll be arguing for Apple. Ms. Raymond is arguing for Samsung. There were two petitions, which is why we're both arguing. I'll start with downstream data and start with specifically the claim language because that's really, we believe, controlling here. Do you agree that ordinarily speaking, when we talk about downstream data, we're talking about data that's going from a server to a client? No, Your Honor. I don't believe that that was established. Upstream would be going back from the client to the server? Your Honor, when we look at some of these dictionary definitions that were submitted, downstream and upstream are simply meant to refer to data flowing. Downstream is data flowing towards something. Upstream is data flowing away from something. In the most abstract context, fine, but how about the client-server context? Not necessarily, again, Your Honor. When we look at these specific claims here, these claims are directed towards, as Your Honor pointed out, they're directed towards the device, only the WIPs. When Rosetta wanted to claim a system that included more than the WIPs, they knew how to do that. Claim 23 is a perfect example. Claim 23 is an independent claim. It is directed towards a communication system. Claim 23 is not at issue here. That is not one of the challenge claims. Rosetta clearly knew. Does Claim 23 claim a three-node system? Well, under Rosetta's interpretation, it would, but what Claim 23 covers is, if we look at Figure 1, Claim 23 covers the telephone. Right, 24. Exactly. So in that case, Claim 23, if you drew a box around it, it would cover the WIPs, the display device, and the telephone, which is a system because it's multiple components. They did not claim that in Claims 1 and Claims 58. They specifically chose to claim only the device, and there's probably reasons for doing so. There's infringement reasons for everything. But when we look at the specification, then, the specification very clearly says that Figure 1 is directed towards a wireless synchronization system, of which the WIPs is only a part. So if we were to begin to read in limitations from Figure 1 into the claims, we would be converting that device claim of Claim 1 into a system claim, and that is not what Rosetta chose to claim. When we look at the standard claim construction principles here, first of all, there is no evidence that downstream data is limited to data that only comes from a quote-unquote source server, whatever that is. Second of all, as Your Honor, Judge Ranum said, source server isn't even in the specification. That word does not appear anywhere in the specification. So it would just be against all claim construction principles to not only read in a limitation from the specification from an embodiment that's only labeled a exemplary embodiment and from an embodiment that's directed towards a system, not the device. But second of all, we'd be reading in something that isn't even in the patent. The word source server, as my colleague was not able to point to, it does not appear anywhere in the specification. This reading in such a limitation is just strictly contrary to Phillips, where this court said if we begin reading limitations from the specifications into the claims, we would never know where to stop. And that's a good example here because Rosetta would ask and the dissent would ask that when we look at Figure 1, only the WIPs and whatever is at the very top of Figure 1, what I believe Rosetta calls the source server, should be read into the claim. But what about the intervening wireless network management system? What about the intermediate Network 28? What about the first wireless Network 20? Why would we choose to read in only the element at the top of Figure 1 and not all those intervening elements? Clearly, the board got this right. The board found that Figure 1 was not part and parcel. It was not commensurate with the scope of Claim 1. And for that reason, we believe that the board's construction is the correct one. Are there any other questions about downstream data? No. If I may, there's another claim limitation that is at issue here that I'd like to briefly address. That is network server. Now, this is directed towards the WIPs itself, the device. In the patent, it's called a wireless intelligent personal server. They added the word network in there, so it's a wireless intelligent personal server. Could network server mean a server that is serving a network of computers? Not in this case, Your Honor. And the reason why is, first of all, as the board correctly found, the IEEE dictionary defines network to be at least two or more interconnected devices. So all the claim requires when we look at the common and ordinary meaning of network itself is two devices connected together. What Rosetta proposes is a claim construction that specifically excludes the ability of the WIPs to communicate with another device in a point-to-point communications link. The board found that's contrary to the common and ordinary meaning of network based on that dictionary definition. Under this court's precedent, that finding does deserve deference. It's based on extrinsic evidence. But second of all, the specification specifically says that the WIPs may communicate with the external display device as if it was acting as a hard drive. And the evidence showed, and it was unsputed, that communications between a device and a hard drive, like an external display device and a hard drive, are point-to-point communications links. That is in the appendix at 5505 to 5506. That quote from the specification is at column 6, lines 25 to 27. Do you want to address the obviousness determinations? Yes, and I'll address Comora, Your Honor, which is the first reference that the board found. Now, if this panel affirms the claim constructions, then Rosetta did not contest that Comora invalidates all the claims as obvious with the exception of claims 2 and claim 59. However, with respect to claims 2 and 59, which are dependent claims, those cover a synchronization between one device and the WIPs. Apple's expert testified that synchronization was a well-known step that people of ordinary skill and the art clearly understood. He testified that there was a motivation to modify Comora so that it met the synchronization step. And he testified with respect to not just his own opinion, but he relied on external pieces of evidence, objective pieces of evidence in the forms of other patents. That's at appendix 5060 through 5064. The board specifically found that his testimony was persuasive at appendix 36. And here on appeal, Rosetta does not cite any evidence to the contrary. So this is plainly a case where the board relied on substantial evidence in the form of the expert's unrebutted opinion. And under this court's precedent, like Knowles Electronics, 883 F3rd 1358, a court will not find the PTAB's decision unsupported by substantial evidence simply because the PTAB chose one conclusion over another plausible alternative. That's precisely the case here. The other thing I would say, finally, before turning it over to Ms. Raymond, is with respect to Rosetta's position that this should be a reversal if the panel changes the claim construction, we definitely disagree with respect to Comora. We specifically pointed out that Comora is a three-node device as well. It teaches these three nodes. So that was in our brief at page 65. It was in Apple's brief also at 13 and 14. So at most, if this court were to alter the claim construction, we ask that it would remand for further determination on Comora and not reverse. Thank you, Your Honors. Good morning, Your Honor. May it please the court. I'll be addressing Goggin just very briefly, if I may. For the reasons articulated in our briefing and by Mr. Ferguson, the court should affirm claim construction and therefore affirm unpatentability based on Goggin. And certainly, if there's no source server found to be required by the claims, Rosetta loses. But even if the court has concerns with the claim construction, the board made sufficient factual findings to affirm Goggin because the board found Goggin disclosed at least three nodes. With respect to claim one, Goggin- Did the board really find that? I mean, I know you argued that. Certainly. But I don't know if the board actually relied on your alternate argument that even if the claim is directed to a three-node or more system, that Goggin actually also teaches that. Certainly. We can look at claim eight, which requires a second external display device. We see that in Appendix 57. And there the board found this was disclosed, the second external display device was disclosed in Goggin. And they pointed there to claim seven, where they said petitioner's obviousness showing, this is at Appendix 56, is premised on Goggin's basic teachings that desktop computers and wireless computers can access a Windows CE device, citing Goggin. Desktop and wireless computers, plural. And the way that claim one was mapped, it was mapped with a source of downstream data coming from a PC, and it was mapped with a display device as a PC. And the only dispute here is that Rosetta says that the display device and the source server need to be two different things. Now that's really not captured by their construction. But even so, looking at this claim eight and claim seven, what we see is that even if the board mapped the same PC to the source of the downstream data and the display device in claim one, the board's findings for claims seven and eight show that it found Goggin renders obvious a PDA as a display device, that it renders obvious a second PC as a display device. And therefore, for these claims, the board found disclosure of downstream data coming from a PC to the WIPs, just as in claim one, and a display device that's a second PC or a PDA, i.e., a three-node system. And with that, unless there are any other questions, I would just conclude that... The examiner insisted that the word network be added to the claim during the prosecution. I believe that the reason for that was because of the type of data that was being communicated to the WIPs. And there, the data that was being communicated was PEN data in the prior art. And so network server was added to overcome, I believe, that rejection. And that rejection had to do with needing to have a specific type of data that was sent to the WIPs. I don't think it has... There's no dispute here as to what type of data is sent to the WIPs, so I don't believe that the addition of network server is really apropos to the art that's being presented in this case. Is there any questions? Well, I just don't understand why the addition of the word network would somehow overcome a rejection that was based in part on the type of data that was being sent to the WIPs. I think what they were capturing was that there used to be file data that's sent to the WIPs. But the prosecution itself is certainly not clear on this point. And the word network server obviously doesn't appear in the patent either. So we sort of need to look at the language. We see that the dictionary supports the idea that network is communication between two or more computers. It doesn't require three computers. The board found and credited that meaning of network. And I think for that reason, network server is understood to be here, to be two or communication with at least one other computer, which gives you two or more computers. Regardless, again, we have based on the Claim 8 and Claim 7 findings and the board's talking about the CE device communicating with other computers, plural. When we talk about the WIPs, that's where they added the term network server. We, therefore, have a network server, a WIPs, that's communicating with not just one computer, but we know that it can communicate, it communicates with, and Goggin certainly, more than one other device. Can we thank you? Okay. Senator, you have four minutes of time left for rebuttal. Your Honor, briefly I want to return to your question, which is where can you find in the specification reference to a source server. I do want to point the court to references in the specification to source files and electronic files, and the definition of the WIPs is a personal network server. So the word server is inherent in what the WIPs is, and it's a personal version of a network server. It's the personal version, as Rosetta has argued, of the source server that has the source document. So that is exactly the problem that the WIPs is trying to solve, which is to allow up-to-date versions of files, source files, to flow to a remote display device. So I just want to point out source file is on the network, and this is the personal version that captures those source files, so there you can get to the source server. So if we read between the lines of the specification, we can find the source server? Right.  The question for the court is what's the most reasonable interpretation in light of the specification, and as the court held in Smith and Power Integrations, the question is not just is the interpretation foreclosed by what's in the specification, it's is it actually supported by what's in the specification. I want to just note that the interpretation that Rosetta has proffered is indisputably supported by the specification. It's exactly what's described in Figure 1, and it's exactly what's described in Columns 6 and 7 of the patent. On the other hand, there actually is no support for the two-node system that the petitioners have put forward. They've construed a possible interpretation of the claim language, but the inquiry that the court needs to engage in is what is the interpretation that is actually supported by the specification. I submit the figure and the detailed description support. Let me give you a hypothetical. What if I have a laptop computer and one of these portable personal servers, and then I have a file on my laptop and it gets sent and saved on the portable personal server, and then my laptop crashes, and now I need that file, but it's not on my laptop. And so I access the copy that's stored on the portable personal server. Why doesn't that example read on this claim? Because, Your Honor, that's not a downstream data flow. We're not claiming that. That's what Kimmerer is about. That's not what the 511 patent is about. The 511 patent is about the WIPs receiving downstream data, and this is why I think it's so important that they don't dispute, they did not dispute this idea that, in general, a person of skill in the industry understands data flows upstream from a client to a server. So what the patent is claiming is a specific arrangement that receives downstream data. So I guess you're saying my example doesn't fit in your claim, but another example in which laptop one that had a file that I sent to the portable personal server, and then I have a second laptop, and I want to access that file, and I access it from the portable personal server. Now, because I have two laptops, two different laptops instead of a single laptop, this example that I'm now describing does read on the claims. So I will answer that question this way. It is not claimed as just articulated because what you have in that scenario, a direct upload from a computer to the WIPs, that's an upstream data flow. That's not what the WIPs is claiming. What it's claiming is a scenario where there's an external computer sending information, trying to get information somewhere else, that somebody else at the remote display device can't get it because there's no connectivity. That's the problem the WIPs is trying to solve. It's trying to facilitate that downstream data flow. So if that person initially sent data up into their computer network and then took their computer home and accessed it, that's a different story. That is what we're claiming because that's a downstream data flow from that external network to when they go home and work. But in the example you gave, they're just uploading it to the WIPs. That's an upstream data flow. They're not claiming that. You want to conclude? Yeah, I do want to wrap up one, and I just want to tie a knot with Kimra and Gaga, and I will treat them both together this way. They have specifically talked about Gaga and Kimra involving a server-client relationship. They map it on in the server-client way, and I refer your honors to Samsung's brief at pages 11 and 51. They talk about Gaga working in a server-client way. It's an upstream data flow. What Gaga is doing, what Kimra is doing, is just sending data. Same question your honor just asked about, sending data directly to a server. That's an upstream data flow. That's not what this patent is about. That's why those Kimra and Gaga don't render this invention obvious, and it's why their claim construction is wrong. I'm over my time, your honor, so I'm done. Okay, we thank you.